# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

**PAUL BERGER, directly and derivatively on behalf of INCOME OPPORTUNITY REALTY INVESTORS, INC.,**

$\qquad$ **Plaintiff,**

$\qquad$ **v.**

**TRANSCONTINENTAL REALTY INVESTORS, INC., AMERICAN REALTY INVESTORS, INC., PILLAR INCOME ASSET MANAGEMENT, INC., DANIEL J. MOOS, GENE S. BERTCHER, LOUIS J. CORNA, TED R. MUNSELLE, HENRY A. BUTLER, ROBERT A. JAKUSZEWSKI, RAYMOND D. ROBERTS, SR., GENE E. PHILLIPS, and MICKEY N. PHILLIPS,**

$\qquad$ **Defendants.**

$\qquad$ **--and--**

**INCOME OPPORTUNITY REALTY INVESTORS, INC.,**

$\qquad$ **Nominal Defendant.**

**C.A. No.**

## SHAREHOLDER'S VERIFIED DERIVATIVE AND
## CLASS ACTION COMPLAINT

Plaintiff Paul Berger ("Plaintiff") alleges, upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters after due investigation by his counsel, as follows:

## SUMMARY OF THE CLAIMS

1.     Plaintiff is a long-time stockholder of Income Opportunity Realty Investors, Inc. ("IOR," "IOT" or "the Company"), having held shares continuously since at least 2006.  IOR is a Nevada corporation, with corporate offices in Texas. Its shares are publicly traded on the NYSE Arca Exchange.  There are 4,168,214 outstanding shares, of which 786,944 shares are owned by public shareholders.  The remaining 3,381,270 shares (81.25% of all shares) are owned by another publicly-traded company, Defendant Transcontinental Realty Investors, Inc.  ("TCI").  TCI, in turn, is controlled by Defendant American Realty Investors, Inc. ("ARL"), another publicly-traded company.  The remaining individual defendants (with the exception of Defendants Gene E. Phillips and Mickey N. Phillips) are the officers and directors of IOR.  These officers and directors of IOR are also officers and directors of TCI and ARL.

2.     As further described below, Defendant Gene E. Phillips ("Gene Phillips"), a Texas real estate investor, secretly controls IOR, TCI and ARL, through Defendant Pillar Income Asset Management, Inc. ("Pillar"), which he also secretly controls, and runs all of them for his personal benefit.  Defendant Mickey N. Phillips ("Mickey Phillips"), his brother, aids and abets him in doing so, serving as one of two directors of Pillar, a company set up to funnel money unlawfully to companies Gene Phillips controls.  All of these persons and entities, including the officers and directors of IOR, TCI and ARL, and the Phillips brothers, who control these companies, owe fiduciary duties to IOR and its shareholders.

3.     During Plaintiff's time as an investor, IOR has falsely represented itself as a company involved in the business of real estate investment and land development.  In SEC filings, IOR investors were reassured that they were in good hands, as an independent advisor, Defendant Pillar, was involved in "locating, evaluating and recommending real estate and real estate-related investment opportunities" for IOR. For these alleged services, Pillar was paid significant fees each year.  (IOR Annual report on SEC Form 10-K, filed March 31, 2017, p. 42).

4.     The true facts are otherwise.   IOR and its non-affiliated public shareholders are the victims of an illegal "daisy chain" scheme whereby related corporations and individuals funnel funds from the lowest level corporation (here IOR) up the daisy chain and steal those funds for the other participants (here TCI,

ARL and the Phillips family).  In schemes such as this, companies such as IOR at the low end of the daisy chain have their assets removed never to be returned, all under the guise of purportedly legitimate corporate transactions.  The ownership and hierarchy of the interconnected entities is depicted in the diagram at ¶23, *infra.*

5.      IOR has been looted of tens of millions of dollars by the Defendants, leaving it bereft of the ability to engage in any sort of new business or pay dividends. Indeed, as of September 30, 2018, IOR reported just $1,000 in cash on its balance sheet (IOR Form 10-Q for the quarter ending September 30, 2018, filed November 13, 2018), which was the result of at least ***$32 million*** having been funneled to TCI and its cohorts in less than two years without explanation.  This includes real estate worth $7.5 million transferred to TCI in 2018 without basis.  SEC filings contain no explanation of where IOR's funds have really gone.  Nor is there any stated promise from TCI ever to repay IOR or return its property. And, while TCI purports to pay interest on the amounts it has seized from IOR, no interest payments have ever been received by IOR.   Such phantom interest payments (incidentally at lower than market interest rates) simply get "accrued."  IOR's third quarter report for the period ending September 30, 2018 reveals that 85.7% of all IOR assets have been converted to the use of TCI, with the remainder of IOR's assets invested in notes issued by a TCI affiliate.  (IOR has historically owned other similar notes and, as they came due

to IOR, TCI took the money).  In total, TCI has pilfered (or has used for purposes unknown) at least $81.7 million that belongs to IOR.

6.    In addition to the above, TCI owes IOR tens of millions of dollars stemming from: (a) promissory notes never repaid; and (b) TCI's refusal to honor its contractual obligation to repurchase for $13 million plus interest, land that was sold to IOR by TCI many years ago.  Thus, the harm done to IOR is not limited to absconding with IOR funds as they come in, but also includes broken promises by TCI involving loans and real estate deals, described *infra*.

7.    That IOR has been stripped of almost all of its assets is not surprising once the history of IOR's secret controller, Gene Phillips, is known.  That Gene Phillips controls IOR has been a carefully guarded secret.  His name appears in none of IOR's SEC filings.  Gene Phillips also covertly controls TCI, ARL (TCI's parent) and Pillar, the supposedly independent financial advisory firm.  Indeed, unknown to IOR investors, the fact of Phillips' secret control of these companies, including TCI, ARL (American Realty Investors, Inc.), IOR, and Pillar, was found by a Texas bankruptcy court Judge in the course of determining that Gene Phillips had filed a case for one of his controlled entities in bad faith so as to evade judgment creditors.[1]

---

[1] "Gene Phillips ("Phillips"), a local real-estate investor and former banker and insurance company owner controls at least three publicly-traded entities, American Realty Investors, Inc. ('ARI'), Transcontinental Realty Advisors, Inc. ('Transcontinental' or 'TCI') and Income Opportunity Realty Investors, Inc. ('IOR') (collectively, 'The Pillar Entities'). Each of these companies is operated through

In that case, referred to herein as "the *ART Case*", the Court noted that bankruptcy cases filed by Phillips for his entities have been dismissed at least *five times* due to bad faith. (*See* **Exh. 1** at 000002,[2] attached hereto).

8.      In the *ART Case*, the bankruptcy court described Gene Phillips as "the real head of the enterprise" (**Exh. 1** at 000010), and recounted numerous "badges of fraud", including evidence of the creation of phantom debts in large amounts, back-dating of documents, sworn affidavits that did not appear to be true, and the use of a front man to conceal the Debtor's true controller.[3]  Among that Court's conclusions: "Debtor's lack of candor throughout this case also points to the non-confirmability of its [Chapter 11] Plan." (**Exh. 1** at 000015).

9.      That case is now proceeding in the United States District Court for the Northern District of Texas.  Summary judgment was recently denied to Gene Phillips and a number of associated defendants.  The Court found that sufficient evidence existed that Gene Philips controls ARL (the ultimate parent of TCI and IOR) through

Pillar Income Asset Management ('Pillar')."  *In re American Realty Trust, Inc.*, CASE NO. 13-30891-HDH, slip op. at 2 (Bankr. N.D. Tex. March 3, 2014) (Dkt # 256), attached hereto as part of **Exh. 1** (000001-21).

[2] Citations to Exhibit A reference the page numbers beginning in zero at the bottom of each page of the exhibit.

[3]  This "front man", Ron Akin, was also employed (through a company he allegedly controls) to conduct a questionable transaction with IOR in 2011, as recounted *infra* ¶41.  This transaction was to the benefit of TCI and Gene Phillips and to the detriment of IOR.

his control over Pillar, the purported investment advisor to IOR, TCI and ARL. (The court decision (*Clapper v. American Realty Investors, Inc.,* No. 3:14-CV-2970-D (Aug. 14, 2018)) is attached hereto as **Exh. 2**).

10.    The looting of IOR appears to have been accomplished slowly over a number of years, but accelerated in 2017 and 2018 when IOR came into a great deal of money as a result of a note maturing and the sale of a large parcel of real estate. Equity must intervene before IOR has nothing left.

11.    Plaintiff brings this action in part derivatively for the benefit and protection of IOR.  No demand on the Board of Directors to bring this action has been made since such demand would be wholly futile.  A majority of the members of the IOR Board are active wrongdoers who: (a) *all* simultaneously serve as directors of TCI and ARL—two of the very Defendants who committed the wrongdoing alleged herein (*i.e.*, the wrongdoing that would have been the subject of a demand) and against whom IOR is seeking redress; (b) have concealed and misrepresented who really controls IOR; (c) have knowingly approved false SEC filings; (d) have permitted and aided and abetted the looting of IOR's assets and their transfer to TCI for purposes unknown; (e) have knowingly abdicated their responsibilities as directors; (f) have approved very substantial compensation to Pillar, whose "services" have been almost exclusively limited to looting IOR; (g) are dominated by the Phillips family and have demonstrated corporate conduct that is

intended to further the wishes and interests of the Phillips family above the interests of IOR; and (h) owe and owed fiduciary duties to wrongdoers TCI and ARL and innocent party IOR, and were inherently conflicted in approving the wrongful related party transactions alleged herein on behalf of IOR.  For these reasons, the IOR directors face a substantial likelihood of liability for their conduct (which could not have been a valid exercise of business judgment), are neither disinterested nor independent, and would not and could impartially determine whether to maintain a suit against Defendants (including Defendants TCI and ARL—companies for which they currently serve as directors) on behalf of IOR for damages and other relief.

12.    Finally, in the alternative, should equity prohibit the return of the converted funds to the control of the wrongdoers, Plaintiff seeks on behalf of a class of all public IOR stockholders a judgment that Defendants have engaged in wrongdoing and, therefore, directing recovery to the public shareholders. Such wrongdoing includes, *inter alia:* (1) conversion of the public shareholders' interest in the corporation; (2) distributing a *de facto* dividend to themselves, and excluding the public shareholders from their *pro rata* share; and (3) effecting a *de facto* liquidation of IOR, triggering the public shareholders' contractual right to receive their fair portion of the proceeds thereof, rather than all proceeds being funneled to TCI and the other wrongdoers.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over the derivative claims in this action pursuant to 28 U.SC. § 1332 in that there is complete diversity between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff is a citizen of the District of Columbia while Defendants are citizens of other states.  This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.  The Court also has jurisdiction as to the class claims: (a) under 28 U.S.C. § 1367 (supplemental jurisdiction); and (b) as to all class members under 28 U.S.C. § 1332 and 1367 under *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 566-67, 125 S. Ct. 2611, 162 L. Ed. 2d 502 (2005), which measures diversity be looking only at the named plaintiff and, if such diversity is found, allows supplemental jurisdiction to be exercised over absent class members; here, there is complete diversity between named Plaintiff Berger and Defendants, and should Plaintiff prevail, any payment to him as to his 7,900 shares would exceed $75,000, exclusive of interest and costs. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation with principal headquarters in this District, resides in this District, or is an individual who has minimum contacts with this District sufficient to justify the exercise of jurisdiction over them.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## THE PARTIES

15.     **Plaintiff Paul Berger**, a citizen of the District of Columbia, has held IOR shares continuously since at least 2006.  He presently holds 6,900 shares in an individual account; and 1,000 shares in a Roth IRA.

16.     **Nominal Defendant Investment Opportunity Realty Investors, Inc. ("IOR")** is a Nevada corporation purportedly engaged in land development and real estate investing.  It shares corporate offices with its corporate parents, as described below, and its "Advisor", Defendant Pillar, all of whom are located at 1603 Lyndon B. Johnson Freeway, Suite 800, Dallas, Texas 75234.  The individual defendants described below also maintain their offices at this address.  IOR is a public company, owned 81.25% by Defendant TCI, and 18.75% by members of the investing public. IOR has four directors, each of whom is also a director of TCI and together are the only TCI and ARL directors.  They are: (1) Defendant Henry A. Butler (a Director since February 2011); (2) Defendant Robert A. Jakuszewski (a Director since March 2004); (3) Defendant Ted R. Munselle (a Director since May 2009); and (4) Defendant Raymond D. Roberts (a Director since June 2016) (collectively, "the

TCI/IOR Directors").   IOR's 2018 Proxy Statement represents that: "Messrs. Jakuszewski, Munselle and Roberts serve as directors of ARL and TCI and owe fiduciary duties to TCI and ARL, as well as to the Company, under applicable law." The same can be said for director Butler, for the same reasons, as Butler is Chairman of the Board of TCI and ARL.   IOR has been under the adverse domination of TCI, Defendant Gene Phillips, and the other Defendants herein since at least 2009, and has no ability to independently protect its corporate interests.

17.   **Defendant Transcontinental Realty, Investors, Inc. ("TCI")** is a public company whose shares trade on the New York Stock Exchange.   TCI was incorporated in 1984 in Nevada, with its principal place of business located at 1603 Lyndon B. Johnson Freeway, Suite 800, Dallas, Texas 75234.   TCI is secretly under the control of Defendant Gene Phillips, although TCI's public filings falsely create a contrary impression by stating that Phillips is not an officer or director of TCI and that Phillips only has a vague connection to Defendant Pillar, which in actuality Gene Phillips indisputably controls.   TCI owns 81.25% of the common stock of IOR. TCI has held a majority interest in IOR since July 17, 2009, on which date it purchased 2,518,934 IOR shares from Syntek West, Inc., a company controlled by Defendant Gene Phillips.   TCI made this purchase by assuming a pre-existing debt owed to IOR in the amount of $17,884,431.   Although this purchase was made over nine years ago, there is no report or indication in the SEC filings of either TCI or

IOR that this sum has ever been repaid to IOR, or that any interest on this sum has been paid to IOR.

18.     Defendant TCI's officers and directors overlap as officers and directors of the related corporations, including IOR and ARL. They include:

(a)     **Defendant Daniel J. Moos ("Moos").** Moos, a citizen of the State of Louisiana, has served as President of TCI since April 2007 and Chief Executive Officer, since March 2010, of IOR, ARL and TCI.  Moos has also served as a Director of Defendant Pillar since December 2016; President since December 2010; Chief Executive Officer since March 2011; and Treasurer since October 2013.

(b)     **Defendant Gene S. Bertcher ("Bertcher").**  Bertcher, a citizen of the State of Texas, has served as Executive Vice President of TCI since February 2008, Chief Financial Officer since May 2008 and Treasurer since October 2013 of IOR, ARL and TCI.  He is a Certified Public Accountant.

(c)     **Defendant Louis J. Corna ("Corna").**  Corna, a citizen of the State of Texas, has served as Executive Vice President, General Counsel/Tax Counsel and Secretary since February 2004 of IOR, ARL and TCI.  He has also been Executive Vice President-Tax since April 2011 and Secretary since December 2010 of Pillar. Defendants Moos, Bertcher, and Corna shall hereinafter be referred to as "The Management Defendants."

12

(d)     **Defendant Ted R. Munselle ("Munselle").** Munselle, a citizen of the State of Texas, has been a Director of ARL since February 2004 and Director of TCI since February 2004. ***Mr. Munselle has served as a director of IOR since May 21, 2009.*** Munselle is a Certified Public Accountant.

(e)     **Defendant Henry A. Butler ("Butler").** Butler, a citizen of the State of Texas, has been Chairman of the Board (since May 2009) of ARL; Director (since December 2001) and Chairman of the Board (since May 2009) of TCI. He has been Vice President (since August 3, 2000) of ARL and (since February 1, 2011) of TCI and (since February 8, 2011) of IOR. ***Butler has been a director of IOR since February 8, 2011.*** In addition to these other roles, Butler works a as land sales broker for Defendant Pillar.

(f)     **Defendant Robert A. Jakuszewski ("Jakuszewski").** *Jakuszewski,* a citizen of the State of Illinois, ***has been a director of IOR since March 16, 2004***, and a director of TCI and ARL since November 22, 2005.

*(g)*     **Defendant Raymond D. Roberts, Sr. ("Roberts").** *Roberts,* a citizen of the State of Texas, ***has been a Director of TCI, ARL and IOR (each, since June 2, 2016).***

19.     **Defendant American Realty Investors, Inc. ("ARL")** is a Nevada corporation, with its principal place of business located at 1603 Lyndon B. Johnson Freeway, Suite 800, Dallas, Texas 75234. ARL and a subsidiary own approximately

77.68% of the outstanding shares of common stock of TCI.  ARL is also secretly

under the control of the Phillips.  Over 80% of ARL's stock is owned by related

parties.  Realty Advisors, Inc., a Nevada corporation owns beneficially 85.68% of

ARL.  The sole shareholder of Realty Advisors, Inc. is May Realty Holdings, Inc.

("MRHI"), a Nevada corporation, *the sole shareholder of which is a trust known*

*as the May Trust, which (though not disclosed) is owned 100% beneficially by*

*Gene Phillips' six children.*  ARL, TCI and IOR share common directors (Munselle,

Butler, Jakuszewski and Roberts).

20. **Defendant Pillar Income Asset Management, Inc. ("Pillar")** is a

Nevada corporation, with its principal place of business located at 1603 Lyndon B.

Johnson Freeway, Suite 800, Dallas, Texas 75234, whose control traces back to

Defendant Gene Phillips. According to IOR's 2018 Proxy Statement (which does

not mention Gene Phillips at all): "the sole shareholder of [Pillar] is Realty Advisors,

LLC, a Nevada limited liability company ("RALLC"), the sole member of which is

Realty Advisors, Inc., a Nevada corporation ("RAI"), which is 100% owned by May

Realty Holdings, Inc., a Nevada corporation ("MRHI"), the sole stockholder of

which is a Trust known as the May Trust."  The May Trust, according to testimony

given by Gene Phillips in the Northern District of Texas, is beneficially owned by

Gene Phillips' six (6) children. **Ex. A** at 000037.  In the recent Northern District of

Texas decision, Judge Fitzwater noted that: "According to [defendant herein]

Bertcher, Phillips' family owns 85% of Pillar.  ARI's 2011 10-K filing indicates that the sole stockholder of Pillar is Realty Advisors, which has been described as Phillips' 'personal' company."  **Exh. 2** at 50 n.60.   Pillar has two directors, Defendant Mickey Phillips, Gene Phillips' brother, and Defendant Moos.   The officers of Pillar are Moos (President, CEO, Treasurer and Director), Defendant Bertcher (executive VP and Chief Accounting Officer), and Defendant Corna (Executive Vice President, Secretary, Tax Counsel and General Legal Counsel). Pillar ostensibly, as IOR's external Advisor and Cash Manager since April 30, 2011, spends its time "locating, evaluating and recommending real estate and real estate-related investment opportunities" for IOR.   In truth, Pillar does none of these things. Rather, *via* a purported Cash Management Agreement with IOR (which has never been filed with the SEC, despite a requirement to do so), Pillar and its cohorts funnel every last dollar IOR generates to TCI for unspecified purposes.   IOR's Proxy Statement filed with the SEC on November 15, 2018 purports to accurately describe Pillar's cash management activities, as follows:

> Effective April 30, 2011, the Company and Pillar entered into a Cash Management Agreement (the "Pillar CMA") under which all funds of the Company are delivered to Pillar which has a deposit liability to the Company and is responsible for payment of all payables and investment of *all excess funds* which earn interest at the Wall Street Journal Prime Rate plus 1% per annum, as set quarterly on the first day of each calendar quarter. *Borrowings for the benefit of the Company bear the same interest rate.* The Pillar CMA may be terminated at any time without penalty for any reason upon sixty (60) days written notice by either party to the other, but otherwise remains in full force and effect

coterminous with that of the Pillar Advisory Agreement and automatically renews from year to year unless terminated.

However, Pillar has labeled all funds IOR has received as "excess cash" leaving IOR destitute and unable to conduct business or pay dividends to its public shareholders. Moreover, Pillar never returns principal or interest. For these services (essentially siphoning off all of IOR's cash for the benefit of the Defendants), since 2011 Pillar has been paid various fees and reimbursements totaling at least $7.2 million. Moreover, according to further testimony by Gene Phillips in the Northern District of Texas, Gene Phillips receives $1 million per year for his services on behalf of Pillar. *See* **Ex. A** at 000036-37, 40-43.

21.     **Defendant Gene E. Phillips ("Gene Phillips"),** a citizen of the State of Texas, has been found in judicial proceedings to be the behind the scenes controller of IOR, TCI, ARL and Pillar. *Clapper v. American Realty Investors, Inc.,* No. 3:14-CV-2970-D at 49, attached hereto as **Exh. 2**; *In re American Realty Trust, Inc.*, CASE NO. 13-30891-HDH, slip op. at 2, attached hereto as part of **Exh. 1** (000002). He controls these and numerous other companies, while avoiding an official title. He exercises his control over Pillar through his brother, Defendant Mickey Phillips. In recent, testimony, recounted in greater detail *infra,* various Defendants in this action conceded Phillips' covert role and his domination over enterprises that claim (in SEC filings) that he has little or no connection. In this matter, Gene Phillips has been a principal of the scheme (together with the other

Defendants) to denude IOR of its assets, so as to benefit TCI, ARL, the other Defendants, and himself and his family.  These actions follow a pattern seen (and documented) in other cases involving Phillips.

22.   **Defendant Mickey N. Phillips ("Mickey Phillips").**  Mickey Phillips, a citizen of the State of Texas, is the brother of Gene Phillips and one of two directors of Pillar (the other being Defendant Moos).   In that position, Mickey Phillips approved, directed, and carried out the looting of IOR's cash assets and their illicit transfer to TCI.

23.     The ownership and hierarchy of the interconnected entities is depicted

in the diagram below:



## RELEVANT FACTS

### A.   TCI Takes Control of IOR in 2009 and Assumes Responsibility for The Acquisition Note

24.     In July 2009, TCI acquired a majority stake in IOR.  The transaction is described *infra.*  Prior to that time, the majority owner was Defendant Gene Phillips, through his majority control of Syntek West, Inc. ("Syntek West").  At Syntek West, Gene Phillips held the offices of President and CEO.

25.     A corporation's association with Gene Phillips often bodes poorly for its prospects, as many such concerns have collapsed amidst allegations of wrongdoing.   For example, Gene Phillips controlled Southmark Corp. ("Southmark"), which collapsed into bankruptcy in 1989.  According to a 2001 *Wall Street Journal* article:

> Mr. Phillips has long been described as a domineering presence in the boardroom.  A bankruptcy examiner looking into the collapse of Southmark wrote in a 1990 report that the three outside directors were "basically yes-men" who didn't understand the company. Mr. Phillips and his former partner, New York attorney William Friedman, built the once-sleepy REIT into a real-estate syndication machine boasting $9 billion in assets. The examiner, R. Neal Batson, acting under the authority of a Dallas federal bankruptcy judge, concluded that Southmark created "illusory" sales and "phantom" profits by buying massive real-estate portfolios and selling them to limited partnerships in deals Southmark financed. Many partnerships defaulted, helping drive Southmark into bankruptcy. The report said the chairman, Mr. Phillips, and the vice chairman, Mr. Friedman, were chiefly responsible for the collapse and reaped "substantial benefits" at Southmark's expense. These included general-partnership fees from affiliates, Southmark advances to "insider partnerships" and personal loans.

*"Real-Estate Magnate Gene Phillips Draws Ire For Dealings"*, Wall Street Journal,

Feb. 16, 2001, available at:  https://www.wsj.com/articles/SB98227292790013952.

26.     The dissolution of Southmark resulted in Gene Phillips controlling a

number of real estate companies, including those at issue here.

27.     That dissolution settlement, according to the *Wall Street Journal*:

> created an enormous headache for Marilyn H. Patel, a U.S. district court
> judge in San Francisco. More recently known for her work on the music
> industry's lawsuit against Napster Inc., Judge Patel in December 1989
> drew a case called *Olive et al. v. Phillips et al.*, after Jack Olive, a Marin
> County shareholder. In it, several shareholders of Transcontinental and
> three other REITs alleged that Messrs. Phillips and Friedman, the
> advisory company -- now known as Basic Capital -- and various board
> members, among others, wasted corporate assets and engaged in self-
> dealing. The defendants denied all allegations. .... The original
> complaint asked, among other things, that the judge remove the REITs'
> directors and order the companies to pay more dividends. A 1990
> settlement -- the first of three -- required the REITs to pay combined
> dividends of $29.5 million and appoint three independent directors to
> the shared board. It also mandated the formation of board committees
> to monitor deals between the REITs and entities controlled by Messrs.
> Phillips and Friedman and to keep tabs on the voluminous litigation
> against the two men. But within a year, plaintiffs complained the board
> committees weren't doing their jobs, leading to more legal
> maneuvering and another agreement in 1994. That "modification of
> stipulation of settlement" called, among other things, for even more
> independent directors to join the boards and required unanimous board
> approval for related party transactions.

28.     At about the same time, the Office of Thrift Supervision ("OTS")

compelled Phillips and several of his related companies to enter into a Consent

Order.  The preamble to that November 22, 1994 Order states:

> the OTS alleges, as detailed in the NOTICE that PHILLIPS, Syntek

West, Inc., ("SYNTEK WEST") Syntek Investment Properties, Inc. ("SIPI") and The May Trust ("MAY TRUST") (collectively "RESPONDENTS") engaged in unsafe or unsound practices, or breaches of fiduciary duty, or violations of the Federal Deposit Insurance Act, 12 U.S.C. § 1811 et. seq. (Supp. IV 1992) or regulations that resulted in the defalcation of federally insured funds; and bases this Consent order to Cease and Desist for Affirmative Relief and an Order of Prohibition ("ORDER") on such conduct and the results thereof.

29.    That Order barred Gene Phillips from the banking industry and, among other things, required restitution of $20 million.

30.    None of this prevented Gene Phillips from continuing his control and domination over IOR, TCI, and related companies.

31.    It is unclear why Gene Phillips arranged for TCI to assume majority control of IOR in 2009, except that this move coincided with what appears to be an effort by Phillips to avoid listing himself as an officer or director of these companies. Instead of direct control, Gene Phillips exercises power on behalf of IOR, TCI, and ARL by controlling their "Advisor" (which has had various names before assuming the present name of Pillar).  Investors who read IOR's SEC filings can no longer find the name Gene Phillips.  Instead, they are told that Pillar is owned by a maze of companies whose identities would mean nothing to investors not steeped in court filings and testimony that is never brought to their attention.

32.    What is clear is that TCI asserts that on July 17, 2009, it purchased 2,518,934 shares of IOR from Gene Phillips' owned and controlled Syntek West, and made this purchase by assuming a pre-existing debt owed by Syntek West to

IOR in the amount of $17,884,431 (the "Acquisition Note"). There is no evidence in SEC filings that TCI has ever repaid this note. The last specific mention of this debt is contained in the annual report of IOR for the period ending December 31, 2013 (filed March 31, 2014), which stated that the $17.9 million debt to IOR had not been repaid more than four years after TCI assumed liability on the Acquisition Note. Since then, IOR has not received repayment. Based on a very conservative interest rate of prime plus 1% (the rate Pillar allegedly pays on money invested as part of its "cash management" services), *IOR is now owed at least $28 million*, with no hope of actual repayment, except through the present legal action.

33.     Based on the foregoing, TCI should be ordered to pay on the Acquisition Note so that IOR can conduct its business, and the TCI/IOR Directors must be held responsible for such payment personally, if such sum cannot be obtained from TCI.

### B.     Three Parcels Are "Sold" To Related Parties in 2010

34.     In its annual report for the year ending December 31, 2010 on SEC Form 10-K (filed March 31, 2011), IOR reported *three related party real estate transactions* in 2010 (the "2010 Sales"). For each of these related party transactions, the consideration to IOR was not cash but was a note. Moreover, for each of these related party transactions, IOR noted "the inadequate initial investment and questionable recovery of investment cost":

On May 18, 2010, we sold our 10.0% investment in TCI Eton Square, L.P. to TX Highland RS Corp, *a related party under common control,* for a sales price of $1.37 million. This entity owns a 225,566 square foot office and retail center known as Eton Square located in Tulsa, Oklahoma. A three-year note receivable for the full sales price was given as consideration, with an interest rate of prime plus 2.0%, payable at maturity on May 18, 2013. We have deferred the recognition of the sale in accordance with ASC 360-20 due to our continuing involvement, *the inadequate initial investment and questionable recovery of investment cost*.

On September 21, 2010, we sold our investment in Transcontinental Brewery, Inc. to Warren Road Farm, Inc., *a related party under common control*, for a sales price of $3.8 million. This entity owns a 29,784 square foot storage warehouse and 13.0 acres of land known as Eagle Crest located in Farmers Branch, Texas. The buyer assumed the existing mortgage of $2.4 million, secured by the property. A five-year note receivable for $1.4 million was given as consideration, with an interest rate of 6.0%, payable at maturity on September 21, 2015. We have deferred the recognition of the sale in accordance with ASC 360-20 due to our continuing involvement, *the inadequate initial investment and questionable recovery of investment cost*.

On December 24, 2010, we sold 6.6 acres of land known as Three Hickory land located in Farmers Branch, Texas to Fenton Real Estate, Inc., *a related party under common control*, for a sales price of $1.2 million. A five-year note receivable for $1.2 million was given as consideration, with an interest rate of 6.0%, payable at maturity on December 24, 2015. We have deferred the recognition of the sale in accordance with ASC 360-20 due to our continuing involvement, *the inadequate initial investment and questionable recovery of investment cost*. [Emphasis added.]

35.     Although IOR's SEC filings are muddled, there is no mention of *any* payment of these notes when they came due. However, on March 13, 2014, the Three Hickory parcel was sold back to IOR, for which IOR was required to pay $1.2 million in cash, even though the parcel had a cost basis of zero to the related-party

seller (*i.e.,* the related-party seller had paid absolutely nothing for the property).  *See*
¶¶47-52, *infra*.

36.     The accounting treatment accorded to these three deals reflects use of
the "cost recovery method."  The website www.AccountingTools.com describes the
cost recovery method as follows:

> Under the cost recovery method, a business does not recognize
> any income related to a sale transaction until such time as the cost
> element of the sale has been paid in cash by the customer. Once the
> cash payments have recovered the seller's costs, all remaining cash
> receipts (if any) are recorded in income as received. This approach is to
> be used when there is considerable uncertainty regarding the collection
> of a receivable. This is by far the most conservative of all revenue
> recognition methods. ***Realistically, its use calls into question why the
> seller is even doing business with the buyer***. [Emphasis added.]

37.     The Defendants responsible for the failure to pay IOR what it is due
must be called to account for the 2010 Sales and the non-recovery of the sales prices
in 2013 and 2015 in the amount of $1.37 million, $3.8 million, and $1.2 million,
respectively.

### C.     The Sham Centura Land Deal

38.     A series of transactions involving 10.8 acres of what was described as
"Centura land" (the "Centura Land Deal") were effectuated by TCI with the
following illicit goals:  (1) erasing a $6.9 million note payable from TCI to IOR; (2)
providing TCI with $6.1 million in cash; and (3) then extricating TCI from its

contractual promise to buy back this parcel from IOR for $13 million, plus 9% interest per annum accruing from the initial closing date.

39.    In IOR's  annual report on Form 10-K for the year ending December 31, 2011, p. 4 (filed March 30, 2012), IOR's purchase  of the "Centura land" parcel was described as follows (emphasis added):

> In 2005, IOT[4] purchased 10.08 acres of Centura land, located in Dallas County, Texas, from TCI (a related party) *for $13.0 million.* The purchase price was paid with cash of $6.1 million and the conveyance, to the seller [TCI], *of $6.9 million in notes receivable held by [IOT].* *The cash was obtained from financing the land acquired in the transaction. The agreement included a put option whereby IOT had the right to resell the property to the seller for a price of $13.0 million plus a preferred return of 9% per annum accruing from the closing date*. Due to the related party nature of the transaction, *including the likelihood that [IOT] would exercise its put option*; this transaction had been treated as a financing transaction. IOT continued to carry the $6.9 million as a note payable and has recorded the $6.9 million as a receivable from TCI. TCI pays IOT interest in an amount equal to what IOT pays for its loan on the property.

40.    By mid-2011, the put option had not yet been exercised, and TCI's obligation to IOR under the put option was, with interest payable at 9% per annum, roughly $22 million.  TCI could afford to pay this obligation.  As of June 30, 2011, TCI had an equity value of $133 million.

41.    Instead of honoring the sale terms, TCI undertook to evade them. Through Pillar and Gene Phillips, it arranged for a sham transaction involving the

---

[4] IOT, like IOR, is an acronym for Investment Opportunity Realty Investors, Inc.  In other words, IOT and IOR are different acronyms for the same entity.

transfer of the land to ABCLD Real Estate, LLC ("ABCLD"), a company run by a long-time Phillips cohort named Ronald Akin.  The purported purchase price was $13 million. However, IOR never received any payment from ABCLD or Ronald Akin for the land.  As IOR's Form 10-K for the year ended December 31, 2011 (filed March 30, 2012) explained:

> On August 2, 2011, we recognized the sale of 10.08 acres of land known as Centura land located in Dallas, Texas, to ABCLD Real Estate, LLC ("ABCLD"), ***a related party under common control, for a sales price of $13.0 million.*** The buyer assumed the existing mortgage of $7.2 million secured by the property.  Ownership of this property was then transferred from ABCLD to the lender. ***There was no gain or loss recorded on the sale***. [Emphasis added.]

42.    That "no gain or loss was recorded on the sale" was untrue.  This very same transaction was described in the Form 10-K for the year ended December 31, 2011 filed by IOR's ultimate corporate parent, ARL, on April 4, 2012 which reported results on a consolidated basis with IOR and TCI.  That report reveals at p. 11.

> On August 2, 2011, we recognized the March 23, 2011 sale of 10.08 acres of land known as Centura land located in Dallas, Texas, to ABCLD Real Estate, LLC, a related party under common control, for a sales price of $13.0 million. The buyer assumed the existing mortgage of $7.2 million secured by the property. ***We recorded a loss on sale of $0.6 million when ownership transferred to the existing lender***. [Emphasis added.]

43.    This loss indicates that the property had a carrying value of $13.6 million.  Yet IOR was paid nothing for it—not the $13 million sales price

26

purportedly agreed upon by ABCLD, and certainly not the $13 million plus interest at 9% per annum as agreed to by TCI.

44.     In 2013, after various maneuvers by ABCLD to keep control of the Centura Land, IOR and TCI closed the books on this deal—to IOR's detriment. See ¶44.   TCI erased the $6.9 million note it owed to IOR, kept the $6.1 million it was given in 2005, and evaded its $13 million plus interest put obligation. Id. This was all reported in a misleading manner in IOR's Form 10-K, p.7, for the year ended December 31, 2014 filed March 31, 2015.

45.     The SEC has sent inquiries to TCI regarding its related party transactions with ABCLD.  TCI has provided inconsistent, evasive and inaccurate replies. *See* **Exh. 3** hereto (correspondence in 2013 with the SEC).

46.     IOR has suffered significant damage from the Centura Land Deal.  TCI cannot be permitted to evade its "put" obligations—coupled with the obligation to pay 9% annual interest.  TCI now owes IOR in excess of $39 million.   All Defendants (with the exception of Defendant Roberts, who was not on the board at the time), permitted and caused this sham Centura Land Deal to occur, and have attempted to permanently bar IOR from exercising its rights.  Each such Defendant is liable for the full amount of the damages incurred.

### D.   <u>The Three Hickory Sale</u>

47.     TCI took advantage of IOR in early March 2014 by selling it a worthless land parcel, in particular the Three Hickory land sold by IOR to a related party in 2010 (*see* ¶¶34-35, *supra*).

48.     IOR's Form 10-K for the year ending December 31, 2014, filed March 31, 2015 states:

> On March 13, 2014, 6.6 acres of land known as Three Hickory located in Farmers Branch, Texas was transferred back to TCI as a result of the settlement agreement with the lender.  On the same day TCI sold the land to the Company [IOR] for the cost basis of $1.2 million

49.     There was no purpose to this sale other than to foist this property onto IOR, and the reference of a $1.2 million cost basis omitted the facts surrounding the true nature of the transaction.  The description of this same transaction  in the Form 10-K for the year ended December 31, 2014 filed on March 31, 2015 by TCI (IOR's parent) reveals what really happened:

> On March 13, 2014, 6.6 acres of land known as Three Hickory located in Farmers Branch, Texas was transferred back to the Company [TCI] as a result of the settlement agreement with the lender.  On the same day TCI sold the land to [IOR] for $1.2 million *which resulted in a gain of $1.2 million.*

50.     If receipt of $1.2 million resulted in a gain of $1.2 million, TCI's cost basis of the land was zero, and IOR was forced to pay $1.2 million for land having apparently very little value.

51.     In the years following this transaction, there does not appear to be any further mention of IOR's ownership of the Three Hickory parcel.

52.     All of the responsible Defendants are liable for the full amount of the damages incurred.

### E.     The Farmers Market Easement

53.     For many years, IOR and TCI were invested in a land development in Farmers Market, Texas.   Indeed, the land in that community was IOR's most important asset.   At the end of 2014, IOR's primary land investment was 178 acres in the Mercer Crossing development in Farmers Market.   The website for Mercer Crossing describes the planned development as follows:

> Once you cross over into new master-planned community Mercer Crossing, you'll feel transported into a community that is inspired by the historic architecture of 17th century England but still innately Texas. By taking Tudor architecture and weaving it with contemporary Texas-style elements, Mercer Crossing will be a community unlike any other in the Dallas area. It will be a community unlike any other in the entire southwest.
>
> Part of the community is intended for urban commerce with shops, restaurants, coffee bars, studios, and offices for small to large businesses. The rest will be 6 distinct residential neighborhoods with parks, trails, and open space designed to replicate the English countryside.

54.     Given these ambitious plans, IOR's Mercer Crossing land was potentially very valuable.

55.    IOR's Form 10-K for the year ending December 31, 2015, filed March 30, 2016, reported that IOR had lost the use of a fair part of its land due to the sale of an easement:

> During September 2015, the Company, ***in exchange for a $3.0 million payment, granted additional easement rights to the City of Farmers Branch, Texas.***   The Company retained title to the property and recorded the payment as a reduction in real estate land holdings. [Emphasis added.]

56.    Although IOR had practically no cash, there is no record in its filings of ever having received this $3 million—rather, it seems to have been immediately funneled to TCI to become yet another "never to be received" receivable.

57.    The Defendants herein (other than Roberts, who became involved later) conspired to deprive IOR of these funds.  They are responsible for the return of this sum, plus interest.

### F.    The Mercer Crossing Sales Proceeds

58.    By the end of 2015, IOR had two significant assets--the Mercer Crossing land and $24.8 million in interest-paying notes due several years hence from a TCI affiliated project known as United Housing Foundation.

59.    IOR's  Form 10-K for the year ended December 31, 2015, filed March 30, 2016, reported that the Mercer Crossing land was in the process of being sold:

> In November 2015, the Company [IOR] entered into a sales contract with an unrelated party.  The contract was for all of the developable land owned by the Company.  In addition, TCI, ARL and RAI also sold land in this transaction.  ***Total consideration for the sale was $75***

*million*. The ultimate allocation of sales proceeds to the parties involved is yet to be determined and will be completed when the final use of the land, certain development commitments are completed and the note is collected. The agreement between the parties to this transaction provides for TCI to hold the subordinated note from the buyer in the amount of $50 million. At the closing, the note payable to related parties of $9.6 million was paid off. ***Due to an inadequate down payment from the buyer and the level of seller financing involved, the transaction is being accounted for under the deposit method. Under the deposit method, no revenue is recognized and the asset sold remains on the books until the criteria for full revenue recognition are met***. [Emphasis added.]

60.     This sale had the potential to produce a large influx of cash to IOR, allowing it to aggressively further its stated business of land development and investment.  But the Defendants did not permit this to happen.   It took two years for this sale to be completed, and when it was, $22.5 million from the sale which was earned by IOR was instead funneled to TCI, and those funds have disappeared without any explanation.  TCI claims it accrues interest on this sum and others, but IOR has never seen a penny of it and, absent a recovery through this action, never will.

61.     As the report filed on November 13, 2018 by IOR on Form 10-Q for the third quarter ending September 30, 2018 reveals:

At November 2015, Company real estate land holdings, carried at cost of $22.7 million, consisted of 131.1 acres of developable land, located in Farmers Branch, Texas. In November 2015, the Company [IOR] entered into a sales contract with an unrelated party (the "Developer"). The contract was for all of the developable land owned by the Company as well as other land held by TCI, ARL and Realty Advisors, Inc. ("RAI") (collectively the "seller"). Total consideration for the sale was

$75 million. The agreement among the parties to this transaction provides for TCI to hold the subordinated note from the buyer in the amount of $50 million. At closing, due to the inadequate down payment from the buyer and the level of seller financing involved, the transaction was accounted for under the deposit method. Under the deposit method, no revenue was recognized and the asset sold remained on the books until the criteria for full revenue recognition is met.

In the third quarter of 2018, the criteria for full accrual accounting was met, and approximately $22.5 million of sales proceeds were recognized under the contract. Sales to unrelated third parties, by the Developer, of real estate carried at cost of $15.1 million, resulted in a gain on sale of $7.3 million to the Company. The unsold balance of land, subject to the original sales contract, was deeded to TCI on August 22, 2018 by the buyer. In connection with the transfer of legal title to TCI by the buyer, the Company transferred its remaining real estate to TCI for its book value of $7.5 million. As of August 22, 2018, the Company had no real estate holdings.

62.   ***The IOR balance sheet for the quarter ending September 30, 2018 shows that IOR has only $1,000.***   Thus, in late 2018, ***TCI, with the help of all Defendants herein, absconded not only with $22.5 million in cash but a parcel of land with a book value of $7.5 million, with no consideration paid for that parcel***.

63.   The $30 million in combined cash and land value must be returned to IOR by the Defendants, with interest.

### G.   The United Housing Foundation Notes Payoff

64.   In addition to the above, IOR received proceeds of $7.1 million from the payoff of two of the notes receivable from the TCI-affiliated Unified Housing Foundation, Inc. during the second quarter of 2017. This was reported in IOR's Form 10-Q for the second quarter of 2017, at p. 9.   These funds then did not appear on

IOR's balance sheet as cash. Rather, these funds and others received at that time served to increase the "receivable" owed from TCI by more than $9 million from the first to the second quarters of 2017.

65. These proceeds were, thus, immediately seized by TCI, never to be accounted for or returned to IOR.

66. This $7.1 million must be returned to IOR by the Defendants with interest.

### H. **The Present State of Affairs**

67. The latest available financial statement for IOR is reported in IOR's Form 10-Q filed with the SEC for third quarter ending September 30, 2018. As of September 30, 2018, IOR reported $1,000 in cash; $81,270,000 in "Receivable and accrued interest from related parties," which actually represents IOR's cash now in the coffers of TCI or spent in unknown ways by TCI; and $13,577,000 in "Notes and interest receivable from related parties," which were interest-paying notes from related party United Housing Foundation with the face value of $13.6 million. Thus, 85.3% of IOR's assets have been taken by TCI. At least $69.9 million has been misappropriated from IOR by TCI through various related party real estate transactions, loans and investments, summarized as follows:

(a) Non-payment of the Acquisition Note with a face value of $17.9 million (*see supra* ¶¶31-32);

(b) Non-payment of $6.4 million in notes in connections with the 2010 transactions, detailed *supra* ¶¶34-37, 47-52;

(c) The $13 million in cash and notes transferred to TCI as part of the Centura Land deal (*see supra* ¶¶38-46);

(d) The $3 million paid for the Farmers Market Easement (*see supra* ¶¶53-57);

(e) The $22.5 million from The Mercer Crossing Sales Proceeds (*see supra* ¶¶58-63); and

(f) The $7.1 million in United Housing Foundation note repayments in 2017 (*see supra* ¶¶64-66).

None of the sums above include interest owed, which is substantial.

68.     IOR has been left in a financial position where it cannot operate.

69.     Plaintiff brings this action derivatively, but also in the alternative, directly, under several equitable doctrines:

- **First,** there may be no adequate derivative remedy available. If the funds are returned to IOR, they will be placed back in the hands of the wrongdoers.

- **Second,** the Defendants' actions amount to a *de facto* dividend to TCI, which is unlawful, as the public shareholders have not been allowed to

participate *pro rata* in this dividend, as the IOR Articles of Incorporation require.

- **Third,** to the extent IOR is in the process of a *de facto* liquidation, the public shareholders are entitled to receive their *pro rata* portion of the proceeds as they become available.

## DERIVATIVE DEMAND FUTILITY ALLEGATIONS

70.   Plaintiff incorporates by reference all previous allegations.

71.   Plaintiff is and has been an IOR stockholder since at least 2006.

72.   Plaintiff will adequately represent the interests of IOR should this action proceed derivatively.

73.   Plaintiff has not made a demand on the Board of IOR to institute this action against the Defendants because such a demand upon IOR's four directors to bring this action would be futile.

74.   IOR has four directors, ***each of whom is also a director of TCI and ARL***. They are: (1) Defendant Butler (since February 2011); (2) Defendant Jakuszewski (since March 2004); (3) Defendant Munselle (since May 2009); and (4) Defendant Roberts (since June 2016) (collectively, "The TCI/IOR Directors").

75.   IOR's 2018 Proxy Statement filed November 15, 2018 represents that: "Messrs. Jakuszewski, Munselle and Roberts serve as directors of ARL and TCI and owe fiduciary duties to TCI and ARL, as well as the Company [IOR], under

applicable law." The same can be said for director Butler, for the same reasons, in that Butler is Chairman of the Board of TCI and ARL and a director of IOR. TCI is one of the primary Defendants in this action. The TCI/IOR Directors owe fiduciary duties to TCI and ARL (as well as to IOR) and cannot make an impartial decision as to whether to pursue this action against TCI and ARL on behalf of IOR.

76. Moreover, the TCI/IOR Directors stood on both sides of the wrongful related party transactions alleged herein, and are "dual fiduciaries" and cannot disinterestedly consider whether to bring these claims on behalf of IOR against TCI and ARL while serving as directors, and owing fiduciary duties to, all three entities, and having approved the related party transactions challenged while standing on both sides of them. Individuals who act in a dual capacity as directors of two corporations, one of whom is parent and the other subsidiary, owe the same fiduciary duty to both corporations, and in the absence of an independent negotiating structure, or the directors' total abstention from any participation in the matter, none of which occurred here,[5] this duty is to be exercised in light of what is best for both companies.

77. Where the interests of the parent and subsidiary in a transaction diverge, as they do here, directors who stand on both sides of the transaction ("dual

---

[5] Although IOR's Articles of Incorporation require related party transactions to be fair to IOR and independently approved, this requirement was ignored by the TCI/IOR Directors, in bad faith and in breach of the duty of loyalty.

fiduciaries"), like the TCI/IOR Directors, face an inherent conflict and are interested parties for demand futility purposes.

78.    The TCI/IOR Directors have breached the duty of loyalty by approving conflicted, unfair transactions and have acted in bad faith.

79.    The TCI/IOR Directors have, as pled herein with particularity, overseen, approved, acquiesced and knowingly participated in the looting of IOR, and the elimination of its ability to do business and pay dividends, all such acts being unlawful.  Each of the TCI/IOR Directors, who collectively comprise the entire Board of Directors of IOR and TCI, faces a substantial likelihood of liability for these alleged breaches of fiduciary duty and other misconduct and cannot make a disinterested determination as to whether to pursue this action.

80.    Moreover, IOR (and its four directors) have been and are under the adverse domination of TCI, Defendant Gene Phillips, and the other Defendants herein since at least 2009, and IOR has no ability to independently protect its corporate interests.  Indeed, the Defendant TCI/IOR Directors—in approving the series of clearly conflicted and interested transactions for the benefit of TCI, ARL, and the Phillips—have also demonstrated corporate conduct that is first and foremost intended to further the wishes and interests of the Phillips (regardless of the impact on IOR).  Thus, the TCI/IOR Directors also cannot make an independent decision as to whether to institute this action against Defendants, including the Phillips.

81.     Thus, under the circumstances presented here, a demand upon IOR's Board of Directors to bring this action would be a futile and useless act because a majority of the Board (in fact *every* member) is conflicted and is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

82.     The acts alleged herein cannot reflect a reasonable exercise of business judgment, as they amount to corporate looting, which is unlawful.

## CLASS ACTION ALLEGATIONS

83.     Plaintiff brings this action, in the alternative, on behalf of himself and all other similarly situated public IOR stockholders (the "Class") pursuant to Rule 23(a), 23(b)(1) and 23(b)(2) of the Federal Rules of Civil Procedure for injunctive and declaratory relief.  Excluded from the Class are Defendants herein.

84.     **Numerosity**. The Class members are so numerous that joinder of all members is impracticable.  There are over 700 holders of record of IOR stock, and many more beneficial owners.

85.     **Common Questions of Law and Fact Predominate**. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

> a.     whether a traditional derivative action cannot provide an adequate remedy, given IOR's domination by active wrongdoers;

    b.    whether Defendants' alleged conduct is unlawful;

    c.    whether the alleged conduct constitutes a *de facto* dividend or a *de facto* liquidation;

    d.    whether Plaintiff and Class members are entitled to appropriate remedies, including a payment *pro rata* of the moneys wrongfully conveyed to TCI, and any additional damages.

86.   **Typicality.**  Plaintiff's claims are typical of the claims of the members of the Class because, *inter alia*, all have been injured in an identical way by Defendants' misconduct, and Plaintiff has no grievances not shared by all others.

87.   **Adequacy of Representation.** Plaintiff will fairly and adequately protect the interests of the Class members.   Plaintiff has retained counsel experienced in complex shareholder class action litigation, and Plaintiff will vigorously prosecute this action.  Plaintiff has no adverse or antagonistic interests to those of the Class.

88.   **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants.  It would thus be virtually impossible for members of the Class, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if Class members could afford such individualized litigation, the

court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individual litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

89.     Plaintiff seeks certification of the Class under Fed. R. Civ. P. 23(b)(1) as:

(A)  prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; and

(B)  adjudication with respect to the claim of Plaintiff herein would, as a practical matter, be dispositive of the interests of the other members not parties to this action.

90.     Plaintiff also seeks certification of the Class under Fed. R. Civ. P. 23(b)(2) for injunctive relief as Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## CLAIMS FOR RELIEF

### A.    As to All Funds and Properties Which Belonged To IOR And Were Wrongfully Taken By TCI

### COUNT ONE
### (Derivatively on Behalf of IOR Against TCI For Breach of Fiduciary Duty)

91.    Plaintiff repeats and realleges all previous allegations. This Count is brought under Nevada law.

92.    As of September 30, 2018, TCI holds or held at least $81,270,000 of IOR's cash, without reason or justification, leaving IOR with just $1,000 in cash, and unable to conduct business.  Roughly 85.3% of IOR's assets have been taken by TCI.  Whether TCI has distributed these funds to others has no bearing on its absolute obligation to pay back this money.

93.    TCI owes a fiduciary duty to IOR and its shareholders.  This requires TCI to deal with IOR with entire fairness, and with due regard to IOR's interest as a separate corporation, with its own shareholders.

94.    TCI has dealt with IOR unfairly and unlawfully and has deprived IOR of its assets and working capital.  TCI's conduct amounts to corporate looting.

95.    TCI must be declared to have acted in breach of fiduciary duty.

96.    Funds held at any time by TCI must be ordered returned to IOR, with interest at the legal rate.

41

## COUNT TWO
## (Derivatively Against TCI For Unjust Enrichment)

97.     Plaintiff repeats and realleges all previous allegations. This Count is brought under Texas law.

98.     TCI is holding or has invested or diverted at least $81,270,000 of IOR's cash, without reason or justification, without payment of fair interest, for its own benefit.  Plaintiff is aware of no contract concerning these funds between IOR and TCI.  Such funds must be impressed with a constructive trust, and returned, or returned as damages, with interest at the legal rate.

99.     TCI must be ordered to disgorge and make restitution as to the IOR funds, and return the amount of at least $81,270,000, plus interest thereon at the legal rate.  Additionally, should it be the case that TCI has earned profits through the use of IOR's money, those profits were unjustly earned, and must be disgorged to IOR.

## COUNT THREE
## (Derivatively Against Defendants Munselle, Butler, Jakuszewski, and Roberts For Breach of Fiduciary Duty)

100.   Plaintiff repeats and realleges all previous allegations. This Count is brought under Nevada law.

101.   The TCI/IOR Directors, Defendants Munselle, Butler, Jakuszewski, and Roberts, owe an undivided fiduciary duty of loyalty to IOR, that requires them to act in the best interests of IOR.

102.   The TCI/IOR Directors have been directors of IOR at all relevant times, except for Defendant Roberts, who joined the TCI and IOR Boards on June 2, 2016.  The claims asserted against Roberts in this Count, and generally in this Complaint, pertain only to acts that occurred on or after June 2, 2016.

103.   The TCI/IOR Directors have destroyed IOR's business prospects, and conspired in and permitted Pillar, TCI and the other Defendants to transfer IOR's funds to TCI without justification, knowing such funds would never be returned nor interest ever received.

104.   Nor have the TCI/IOR Directors, including Roberts, sought the return of funds so IOR could operate, and conduct its business.

105.   The removal of all of IOR's cash could not have occurred without the approval, acquiesce and assistance of the TCI/IOR Directors.  They have not demanded the return of the cash, with fair interest.

106.   The TCI/IOR Directors have breached their duty of loyalty, and must be held accountable for all damages resulting from their bad faith actions.

## COUNT FOUR
### (Derivatively Against Moos, Bertcher, and Corna For Breaches of Fiduciary Duty and Aiding and Abetting the Breaches of Others)

107.   Plaintiff repeats and realleges all previous allegations. This Count is brought under Nevada law.

108.   The Management Defendants, Moos, Bertcher, and Corna, owe an undivided fiduciary duty of loyalty to IOR, that requires them to act in the best interests of IOR, even though they also have positions with TCI.

109.   The Management Defendants have been the top executives of IOR at all relevant times.   Defendant Moos has served as President of TCI since April 2007 and Chief Executive Officer since March 2010 of IOR, ARL and TCI.   Moos has also served Defendant Pillar as a director since December 2016, President since December 2010, Chief Executive Officer since March 2011 and Treasurer since October 2013.   Defendant Bertcher has served as Executive Vice President since February 2008, Chief Financial Officer since May 2008 and Treasurer since October 2013 of IOR, ARL and TCI.   He is a Certified Public Accountant.   Defendant Corna has served as Executive Vice President, General Counsel/Tax Counsel and Secretary since February 2004 of IOR, ARL and TCI. He has also been Executive Vice President-Tax since April 2011 and Secretary since December 2010 of Pillar.

110.   Defendants' positions with TCI give them control over TCI's acts, and allow them access to knowledge of the true nature of the transactions between TCI and IOR.

111.   The Management Defendants have, in conjunction with the other Defendants, destroyed IOR's business prospects, and conspired in and permitted

Pillar, TCI and the other Defendants to transfer IOR's funds to TCI without justification, knowing such funds would never be returned nor interest ever received.

112.   The removal of all of IOR's cash could not have occurred without the approval, acquiesce and assistance of The Management Defendants.  They have not demanded the return of the cash, with fair interest.

113.   The Management Defendants have breached their duty of loyalty, and aided and abetted the TCI/IOR Director Defendants in their breaches, and must be held accountable for all damages that resulted from their bad faith actions.

**COUNT FIVE**
**(Derivatively Against Pillar For Breach of Contract and Gene Phillips**
**and Mickey Phillips For Tortious Interference With Contract)**

114.   Plaintiff repeats and realleges all previous allegations. This Count is brought under Texas law.

115.   Pillar operated under a purported Cash Management Agreement ("CMA"), which it has concealed from investors.

116.   As described, the CMA only applies to "excess cash."  IOR had no "excess cash."  In fact, it has rarely been left with any cash.

117.   Under its ordinary meaning, and as required by fiduciary principles, "excess cash" is that sum which exceeds what is needed for the company to engage in its stated business.

118.   IOR is not a registered investment company, nor is it a bank.

45

119.   Pillar had no right, and could have no right pursuant to fiduciary principles, to funnel all of IOR's cash to TCI, knowing it would not be returned nor would any claimed interest actually be paid.

120.   Pillar did not manage IOR's cash—rather, it illicitly transferred it to TCI so as to enrich TCI, and the other defendants, including the Phillips family, and impoverish IOR.

121.   Pillar's actions are in breach of contract and have caused damages for which Pillar must be held accountable.  Such damages include all sums transferred to TCI since Pillar assumed its role as "advisor" in 2011, plus fair interest.  Such damages may be estimated at least $40 million.

122.   Moreover, Pillar must return its advisory fees and all other fees unearned under its contract.

123.   Pillar is controlled by Gene and Mickey Phillips. These Defendants caused and directed Pillar's breaches of contract and are therefore equally liable in damages for tortious interference with contract.

**B.**   **Claims Related to Non-Payment of the Acquisition Note**

## COUNT SIX
### (Derivatively Against TCI For Breach of Contract)

124.   Plaintiff repeats and realleges all previous allegations. This Count is brought under Texas law

125.   On July 17, 2009, TCI purchased 2,518,934 IOR shares from Gene Phillips' Syntek West, and made this purchase by assuming a pre-existing debt owed to IOR by Syntek West in the amount of $17,884,431 (the Acquisition Note).  TCI has never repaid this note to IOR and has been provided forbearance on repayment to the present.

126.   TCI has, *via* its power over IOR, prevented IOR from declaring the Acquisition Note due and payable allowing it to continue unpaid for 13 years.

127.   TCI, by its actions refusing payment on various notes, has proven it will not pay, and therefore should be declared in breach or anticipatory breach of its contract with IOR.  Upon a declaration of breach or anticipatory breach, TCI should be ordered the pay the note, with interest, which amounts to approximately $28 million.

### COUNT SEVEN
**(Derivatively Against Defendants Munselle, Butler, Jakuszewski, and Roberts**
**Directors For Breach of Fiduciary Duty)**

128.   Plaintiff repeats and realleges all previous allegations. This Count is brought under Nevada law.

129.   The TCI/IOR Directors, Defendants Munselle, Butler, Jakuszewski, and Roberts, owe an undivided fiduciary duty of loyalty to IOR, that requires them to act in the best interests of IOR.

130.   Although IOR is in desperate need of cash, the TCI/IOR Directors have extended the 13-year-old Acquisition Note indefinitely, and have not declared it due, or tried to collect it so that the repayment can be used by IOR for land development.

131.   Accordingly, the actions of the TCI/IOR Directors have been taken to enrich TCI, are in bad faith, and disloyal.  The TCI/IOR Directors must be held accountable in damages.

**C.**      **Claims Related to the 2010 Sales**

### COUNT EIGHT
**(Derivatively Against the Defendants Munselle, Butler, Jakuszewski,**
**For Breach of Fiduciary Duty)**

132.   Plaintiff repeats and realleges all previous allegations. This Count is brought under Nevada law.

133.   On May 18, 2010, IOR sold its 10.0% investment in TCI Eton Square, L.P. to TX Highland RS Corp, "a related party under common control," for a sales

price of $1.37 million.  A three-year note receivable for the full sales price was given as consideration, with an interest rate of prime plus 2.0%, payable at maturity on May 18, 2013.

134.   On September 21, 2010, IOR sold its investment in Transcontinental Brewery, Inc. to Warren Road Farm, Inc., "a related party under common control," for a sales price of $3.8 million.  A five-year note receivable for $1.4 million was given as consideration, with an interest rate of 6.0%, payable at maturity on September 21, 2015.

135.   IOR's SEC filings do not indicate any attempt by the TCI/IOR Directors to collect these sums.  As the TCI/IOR Directors (here Defendants Munselle, Butler, and Jakuszewski) have repeatedly failed to collect sums due from related parties, it may be inferred that the failure to collect on these notes was purposeful, and in breach of the duty of loyalty.  Accordingly, the TCI/IOR Directors, Defendants Munselle, Butler, and Jakuszewski, must be held personally responsible for these sums, plus interest, in damages.

### D.     Claims Related to the Sham Centura Land Deal

## COUNT NINE
### (Derivatively Against TCI For Breach of Contract)

136.   Plaintiff repeats and realleges all previous allegations. This Count is brought under Texas law.

137.   A series of transactions involving 10.8 acres of what was described as "Centura land" (the "Centura Land Deal") were effectuated by TCI with the following illicit goals:  (1) erasing a $6.9 million note payable from TCI to IOR; (2) providing TCI with $6.1 million in cash; and (3) extricating TCI from its 2005 contractual promise to buy back this parcel from IOR for $13 million, plus 9% interest per annum.

138.   TCI attempted to evade its obligation, keep IOR's cash, and cancel IOR's receivable through a sham transaction with a company under the close influence of Defendant Gene Phillips, ABCLD Real Estate, LLC ("ABCLD").  The transaction involved ABCLD "buying" the property for $13 million rather than TCI fulfilling its obligation.  ABCLD never paid $13 million for the property.

139.   TCI cannot be permitted to use its power over IOR to evade its obligations.  The 2005 contract cannot in equity be allowed to be satisfied by the ABCLD mock purchase. Rather, the 2005 contract should be treated as still owed and payable, with principal and interest now totaling $39 million, which TCI must be ordered to pay.

**E.     Claims Related to the Three Hickory Sale**

### COUNT TEN
**(Derivatively Against TCI and Defendants Munselle, Butler, Jakuszewski, and Roberts**
**For Breach of Fiduciary Duty)**

140.   Plaintiff repeats and realleges all previous allegations.  This Count is brought under Nevada law.

141.   As alleged, in March 2014 TCI foisted on IOR a worthless property, extracting a payment of $1.2 million.

142.   TCI was able to do so because of its power over IOR, and its abuse of that power, which was in breach of fiduciary duty.

143.   TCI was also able to do so because the TCI/IOR Directors were complicit in this action, approved it, and conspired in it.  They, too, acted in bad faith breach of fiduciary duty.

144. Accordingly, all Defendants named in this Count must be held liable in damages.

**F.      Claims Related to the Mercer Crossing Sales Proceeds**

## COUNT ELEVEN
### (Derivatively Against TCI For Breach of Fiduciary Duty)

144.    Plaintiff repeats and realleges all previous allegations. This Count is brought under Nevada law.

145.    As of September 30, 2018, TCI held at least $22,500,000 of IOR's Mercer Crossing proceeds from the sale of the Mercer Crossing land, without reason or justification, leaving IOR with just $1,000 in cash, and unable to conduct business.   Roughly 85.3% of IOR's assets have been taken by TCI.

146.    TCI owes and owed a fiduciary duty to IOR and its shareholders.  This requires TCI to deal with IOR with entire fairness, and with due regard to IOR's interest as a separate corporation, with its own shareholders.

147.    TCI has dealt with IOR unfairly and unlawfully and has deprived IOR of its assets and working capital.  TCI's conduct amounts to corporate looting.

148.    TCI must be declared to have acted in breach of its fiduciary duties.

149.    Funds held by TCI must, with fair interest paid, be impressed with a constructive trust for the benefit of IOR and paid over to IOR.

150.    Alternatively, TCI must be ordered to pay damages in the amount of at least $22,500,000 plus fair interest thereon.

## COUNT TWELVE
### (Derivatively Against All Defendants
### Except IOR For Civil Conspiracy)

151.   Plaintiff repeats and realleges all previous allegations. This Count is brought under Texas law.

152.   The elements of a civil conspiracy include: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result.

153.   When the Mercer Crossing transaction closed in 2018, $22.5 million was transferred to the use of TCI, and not the use of IOR.  It may be inferred from its long-term pattern that TCI had no intention of returning IOR's money, or allowing it to use its own money.  Moreover, a parcel worth $7.5 million was at the same time transferred from IOR to TCI for no purpose or reason.

154.   The acts as alleged could not be accomplished without each Defendant named in this Count playing a role in an agreed course of action.

155.   TCI received the funds and did not return them, pay interest on them, or apply them to any purpose that would further the business of IOR.  The TCI/IOR Directors authorized the acts necessary for the looting to occur.  The Management Defendants undertook the necessary partial and administrative steps needed to effectuate the transfer.  Pillar, Gene Phillips, and Mickey Phillips orchestrated the actual transfer and through the sham vehicle of the investment advisor, Pillar.

156.   Therefore, the Defendants named in this Count are liable for all damages caused by their civil conspiracy, in the amount of, $22.5 million plus interest, and the value of the parcel it seized—*i.e.*, at least $7.5 million, for a total of $30 million.

## COUNT THIRTEEN
### (Derivatively Against TCI For Unjust Enrichment)

157.   Plaintiff repeats and realleges all previous allegations. This Count is brought under Texas law.

158.   TCI is holding or has invested or diverted at least $22,500.000 of IOR's cash, and a $7.5 million parcel, without reason or justification, without payment of fair interest, for its own benefit.  Plaintiff is aware of no contract concerning these funds and that property between IOR and TCI.  The funds and property (or the cash value of the property) must be impressed with a constructive trust, and returned, or returned as damages, with fair interest.

### G.    Claims Related to The United Housing Foundation Notes Payoff

## COUNT FOURTEEN
### (Derivatively Against TCI For Unjust Enrichment)

159.   Plaintiff repeats and realleges all previous allegations. This Count is brought under Texas law.

160.   In addition to the above, IOR received proceeds of $7.1 million from the payoff of two of its notes receivable during the second quarter of 2017.

161.   These proceeds were also immediately seized by TCI, never to be seen or returned to IOR. Plaintiff is aware of no contract between TCI and IOR concerning this matter. Such acts as described herein constitute unjust enrichment.

162.   $7.1 million must be disgorged and returned to IOR by TCI with interest.

## COUNT FIFTEEN
### (Derivatively Against TCI For Breach of Fiduciary Duty)

163.   Plaintiff repeats and realleges all previous allegations.  This Count is brought under Nevada law.

164.   TCI has no justification for transferring the $7.1 million to itself, for its own benefit, and to IOR's detriment.

165.   Such an act constitutes a breach of fiduciary duty, for which TCI must answer in damages.

## COUNT SIXTEEN
### (Derivatively Against All Defendants
### Except IOR For Civil Conspiracy)

166.   Plaintiff repeats and realleges all previous allegations. This Count is brought under Texas law.

167.   The elements of a civil conspiracy include: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result.

168.   As noted, IOR received proceeds of $7.1 million from the payoff of two of the notes receivable during the second quarter of 2017.

169.   These proceeds were also immediately seized by TCI, never to be seen or returned to IOR.

170.   $7.1 million must be returned to IOR by TCI with interest.

171.   The acts as alleged could not be accomplished without each Defendant named in this Count playing a role in an agreed course of action.

172.   TCI received the funds and did not return them, pay interest on them, or apply them to any purpose that would further the business of IOR.  The TCI/IOR Directors authorized the acts necessary for the looting to occur.  The Management Defendants undertook the necessary partial and administrative steps needed to effectuate the transfer.  Pillar, Gene Phillips and Mickey Phillips orchestrated the actual transfer through the sham vehicle of the investment advisor, Pillar.

173.   Therefore, the Defendants named in this Count are liable for all damages caused by their civil conspiracy, to wit, $7.1 million plus interest.

### H.   Class Action Claims (Asserted in the Alternative to the Derivative Claims)

### COUNT SEVENTEEN
### (On Behalf of the Class For a Declaratory Judgment That a *De Facto* Dividend has been Distributed and For a Declaratory Judgment)

174.   Plaintiff repeats and realleges all previous allegations. This Count is brought under Nevada law by Plaintiff directly on behalf of the Class, alternatively to the derivative claims.

175.   Under applicable law, all shares of the common stock are entitled to share equally in dividends from funds legally available therefor.  Dividends should be paid out of excess cash. IOR has no creditors, other than *de minimis* vendors.

176.   The immediate discriminatory distributions of cash being made to TCI, with the approval and acquiescence of the TCI/IOR Directors, constitute a dividend made only to TCI, to the derogation of the public stockholders.

177.   In light of the above, Plaintiff, on behalf of the Class, seeks a declaration that IOR's fiduciaries have effected a *de facto* dividend in a discriminatory manner.

178.   Upon such a declaration, the Class should receive its *pro rata* share of the distribution from the wrongful recipient, which is TCI.

## COUNT EIGHTEEN
### (On Behalf of the Class For a Declaratory Judgment That a *De Facto* Liquidation Has Been Undertaken)

179.   Plaintiff repeats and realleges all previous allegations. This Count is brought under Nevada law by Plaintiff directly on behalf of the Class, alternatively to the derivative claims.

180.   Under applicable law, all shares of the common stock are entitled to share equally in a liquidation from funds generated. IOR has no creditors, other than *de minimis* vendors.

181.   The actions of the Defendant are the equivalent of a liquidation and constitute a *de facto* liquidation.  IOR is plainly winding up its affairs, transferring its assets elsewhere, and failing either to develop land, or otherwise invest in real estate.

182.   Defendants have not followed the statutory requirements for a liquidation under NRS  78.580.

183.   Under these circumstances, Plaintiff and the Class are entitled to a Declaratory Judgment that a *de facto* liquidation is underway, and an order requiring the IOR Board to comply with steps established by statute, and to treat the public shareholders equitably, and not favor TCI.

184.   Upon such a ruling Plaintiff and the Class should receive their *pro rata* share of assets in an orderly manner.

## <u>RELIEF REQUESTED</u>

**WHEREFORE,** Plaintiff demands judgment in favor of IOR and against the Defendants as follows:

A.      Determining that this suit is a proper derivative action and certifying Plaintiff as an appropriate representative of IOR for this action;

B.      Causing TCI to return IOR assets to IOR;

C.      Declaring that TCI has, as pled, committed a breach of contract, breached its fiduciary duty, was unjustly enriched, and participated in a civil conspiracy;

D.      Declaring that Pillar, as pled, breached its contract with IOR;

E.      Declaring that the TCI/IOR Directors, as pled, breached fiduciary duties, and joined in a civil conspiracy;

F.      Declaring that the Management Defendants have, as pled, breached fiduciary duties, and joined in a civil conspiracy;

G.      Declaring that Defendant Gene Phillips has, as pled, joined in a civil conspiracy, and tortiously interfered with contractual rights;

H.      Declaring that Defendant Mickey Phillips has, as pled, joined in a civil conspiracy, and tortiously interfered with contractual rights;

I.      In the alternative, declaring that there has been a *de facto* and discriminatory dividend paid to TCI;

J.      In the alternative, declaring that there has been underway a *de facto* liquidation, and requiring the Defendants to comply with all relevant statutes and rules pertaining to a liquidation;

K.      Awarding the Company, or in the alternative directly awarding IOR shareholders, the amount of damages sustained by the Company as a result of the breaches of fiduciary duties, and other wrongdoing committed by Defendants;

L.      Awarding Plaintiff the costs, expenses and disbursements of this action, including any attorneys' and experts' fees and, if applicable, pre-judgment and post-judgment interest; and

M.      Awarding Plaintiff such other relief as this Court deems just, equitable, and proper.

Dated: February 4, 2019                    Respectfully submitted,

                                           /s/ William B. Federman
                                           William B. Federman, TBA#00794935
                                           FEDERMAN & SHERWOOD
                                           2926 Maple Ave., Suite 200
                                           Dallas, TX  75201
                                           Telephone: (214) 696-1100
                                           Facsimile:  (214) 740-0112
                                           wbf@federmanlaw.com
                                           *Lead Counsel for Plaintiff*

OF COUNSEL:

Laurence D. Paskowitz
**PASKOWITZ LAW FIRM P.C.**
208 East 51st Street, Suite 380
New York, NY 10022
Tel: 212-685-0969
classattorney@aol.com

Roy L. Jacobs
**ROY JACOBS & ASSOCIATES**
420 Lexington Avenue, Suite 2440
New York, NY 10170
Tel: 212-867-1156
rjacobs@jacobsclasslaw.com